## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

UNITED STATES OF AMERICA

v.

MICHAEL A. MORRISON

Case No.: 2:18-AJ-215-JHR

Violations:
Title 18, United States Code,
Sections 669, 1347

## CRIMINAL COMPLAINT

I, Catherine Richard, the complainant in this case, being duly sworn, state that the following is true and correct to the best of my knowledge and belief:

### Introduction

1.     At all times relevant to this complaint:

a.     Trade Winds Health, Swim and Tan Club, hereinafter, The Health Club, operated a physical therapy practice in Rockland, Maine, that did business as Coastal Physical Therapy. CPT provided physical therapy services and received payment for said services from several health insurance plans that affected commerce, including Medicare, Medicaid (or MaineCare), VA-Fee for Services, and Anthem Blue Cross/Blue Shield.

b.     CPT and the insurance plans from whom it received payment were all considered health care benefits programs as that term is defined in Title 18, United States Code, Section 24(b).

c.     These insurance plans reimbursed providers for medically necessary services actually provided by licensed physical therapists or by physical therapist assistants working under the supervision of a Physical Therapist.  They did not reimburse for services provided by a Physical Therapy Aide.

d.     The defendant began working at The Health Club as an athletic trainer in 2002. In 2005, the defendant was promoted to supervise the operations of The Health Club and its

physical therapy practice, CPT.  He was solely responsible for billing claims for reimbursement to insurance plans for physical therapy services rendered by CPT pursuant to the provider agreements entered into between The Health Club and the various insurance plans and the rules and regulations that governed Medicare and Medicaid.

e.        During the years 2014 through 2016, the defendant submitted false claims for reimbursement to Medicare, Medicaid and other health insurance plans affecting commerce that totaled approximately $177,834.

f.        The defendant was also responsible for making bank deposits to the Camden National Bank account utilized by The Health Club and for purchasing supplies for The Health Club, including CPT, through the use of a Capital One credit card.  The defendant's employers authorized him to use this card only for legitimate expenses of The Health Club and CPT.  He was not authorized to use this credit card for personal expenses.

g.        During the years 2011 to 2016, the defendant utilized this Capital One credit card to purchase personal items for himself and his family through Amazon.com.  These unauthorized purchases totaled approximately $70,522.

h.        During the years 2014 to 2016, the defendant stole and embezzled an unknown amount of cash receipts taken in by The Health Club from CPT patients, health club members and tanning customers.

## Counts One
(Health Care Fraud– 18 U.S.C. § 1347)

2.        Paragraph 1 of this complaint is realleged as if fully set forth herein.

3.        From on or about October 1, 2014, and continuing to on or about July 21, 2016, in the District of Maine and elsewhere, the defendant,

### MICHAEL A. MORRISON,

-2-

in connection with the delivery of and payment for health care benefits, items and services, did

knowingly and willfully execute and attempt to execute a scheme and artifice to defraud health

care benefit programs affecting commerce, as defined by Title 18, United States Code, Section

24(b), and to obtain, by means of materially false and fraudulent pretenses, representations and

promises, money and property owned by, and under the custody and control of said health care

benefits programs.

### Purpose of the Scheme and Artifice

4.    It was the purpose of the scheme and artifice to defraud for the defendant to unlawfully

inflate the revenues of The Health Club to cover the theft and embezzlement of funds and

property of The Health Club by the defendant so that the owners of The Health Club would keep

the business open.

### Acts in Execution of the Scheme and Artifice

5.    From 2013 to 2016, the defendant concealed from his employers the fact that MaineCare,

Division of Audit, Program Integrity conducted an audit of The Health Club claims submitted to

MaineCare for the period January 1, 2009 through December 31, 2009, and determined that The

Health Club submitted claims for payment that, among other things, billed for excessive number

of units of service performed by providers, lacked documentation that the services were

medically necessary, and services performed by a physical therapy aide.

6.    From on or about October 1, 2014 to July 21, 2016, the defendant submitted false and

fraudulent claims to health insurance plans, including Medicare, Medicaid, the Veterans Affairs

Fee Basis program, and Anthem Blue Cross and Blue Shield.  Said claims were false and

fraudulent in that they:

a.    Inflated the number of units of service provided to the patient;

-3-

b.      Indicated that a Physical Therapist or a PT Assistant provided the service when, in fact, the service was provided by the defendant, a Physical Therapy Aide;

c.      Indicated that a service was performed by a Physical Therapist who was not an employee of The Health Club as of the date of service; and

d.      Indicated that a service was performed on a specific date when in fact no service was performed.

7.      All in violation of Title 18, United States Code, Section 1347.

## Count Two
(Embezzlement from a health care benefit program – 18 U.S.C. § 669)

8.      Paragraph 1 of this complaint is realleged as if fully set forth herein.

9.      From on or about the July 1, 2013 to on or about June 23, 2016, in the District of Maine and elsewhere, the defendant,

### MICHAEL A. MORRISON,

who was employed as the executive director for a health care benefit program as that term is defined in Title 18, United States Code, Section 24(b), namely the Trade Winds Swim, Tan and Health Club, doing business as Coastal Physical Therapy, knowingly and willfully embezzled, stole and converted without authority to the use of the defendant, who was not the rightful owner, funds and property valued in excess of $100 of said health care benefit program. Specifically, the defendant used his employer's business credit card to pay for purchases he made for himself and his family on Amazon.com, without the knowledge or permission of his employer, causing his employer to use funds of the health care benefit program to pay the credit card bills for these purchases.

10.     All in violation of Title 18, United States Code, Section 669.

This criminal complaint is based on the facts set forth in my affidavit, dated

June 27, 2018, attached hereto and incorporated herein by reference.

Catherine Richard, Special Agent
U.S. Dept. of Health and Human Services
Office of Investigations, Office of Inspector General

Dated:    6/27/2018


Subscribed and sworn to before me this 27ᵗʰ day of June, 2018, at Portland, Maine.

John H. Rich III
United States Magistrate Judge

**AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT**

I, Catherine Richard, a Special Agent of the United States Department of Health and

Human Services, Office of the Inspector General, Office of Investigations, having been duly

sworn, depose and state:

1.      I am currently a Special Agent assigned to the Boston Regional Office, Office of

Investigations, Office of Inspector General, U.S. Department of Health and Human Services

("HHS-OIG").  I have been so employed since September 11, 2011.  Since becoming a Special

Agent, I have received training related to fraud detection and investigation from a variety of

sources including, but not limited to, the Federal Law Enforcement Training Center and HHS-

OIG.  Throughout my Federal Law Enforcement career, I have participated in numerous

investigations involving violations of federal criminal and civil law.  As a federal agent, I am

authorized to investigate violations of laws of the United States and am a law enforcement

officer with the authority to execute warrants issued under the authority of the Federal

Government.

2.      As set forth in the following paragraphs, there is probable cause to believe that Michael

A. Morrison ("Morrison") violated 18 U.S.C. § 1347, Health Care Fraud, and 18 U.S.C. § 669,

Theft or Embezzlement in Connection with a Health Care Benefit Program.

**BACKGROUND**

3.      During the years relevant to this affidavit, Trade Winds was a family owned business

located in Rockland, Maine, that included three separate business entities: the Trade Winds

Motor Inn, Liberty Hospitality LLC, and the Trade Winds Health, Swim, and Tan Club ("The

Health Club"), that also included a physical therapy practice that did business as Coastal

Physical Therapy ("CPT"). The Health Club and CPT operated out of space in the Trade Winds Motor Inn, but were treated as a separate business by the family that owned them.

4.      Michael Morrison ran The Health Club and CPT from 2005 until he was terminated on July 27, 2016.

5.      CPT provided physical therapy services and accepted payment for those services from major health care plans that affected commerce, such as Medicare, MaineCare (which was Maine's Medicaid program), the VA's Fee Basis program, and Anthem Blue Cross/Blue Shield. Therefore, The Health Club and the insurance plans it billed were all considered health care benefit programs, as that term was defined by Title 18, United States Code, Section 24(b).

6.      In December of 2016, I was assigned to the investigation of CPT and Morrison after HHS-OIG received a complaint from the Maine Attorney General's Healthcare Crimes Unit ("HCU") alleging that CPT had submitted suspicious and possibly fraudulent claims to Medicare and MaineCare by upcoding the number of units of services provided to members. The HCU had reason to believe that CPT submitted claims to Medicare and MaineCare for services that it never provided. Furthermore, the HCU alleged that Morrison had embezzled from The Health Club.

7.      I worked on this investigation with a detective assigned to the HCU and a special agent with the U.S. Department of Veterans Affairs, Office of Inspector General.

8.      The information set forth below was based on, among other things, discussions with witnesses and other investigative interviews; information provided to me by other credible law enforcement personnel; the review of records from Trade Winds, WebPT (the company which maintains CPT's electronic medical record ("EMR") system, Therabill), insurance companies, bank records, and other business records.

9.      Where actions, conversations or statements of others are related herein, they are related in substance and in part unless otherwise noted.  Where I assert that a statement or observation was made, I did not personally hear the statement or make the observation unless specifically so stated.  Instead, the information was provided by a witness, an investigator, or another law enforcement officer, either verbally or in writing, who had direct or indirect knowledge of the statement or observation.  Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

### The Medicare Program

10.      During the relevant years, CPT was a Medicare provider.  Title XVIII of the Social Security Act, 42 U.S.C. §§1395-1395kkk-1, establishes the health Insurance for the Aged and Disabled Program, popularly known as the Medicare Program.  The Medicare Program is a federal insurance program that provides health insurance to approximately fifty million Americans, most of them elderly or disabled.  Medicare Part B provides federal government funds to help pay for, among other things, physical therapy services.

11.      The Medicare Program is administered by the Center for Medicare and Medicaid Services ("CMS").  CMS, in turn, contracts with private insurance carriers called Medicare Administrative Contractors ("MACs") to administer, process, and pay Part B claims from the Federal Supplementary Medical Insurance Trust Fund (the Part B Trust Fund).  In this capacity, the MACs act on behalf of CMS.

12.      Medicare requires enrolled providers to comply with Medicare and other Federal health care program laws, regulations, and program instructions as a precondition of government payment.

The Medicare Program often makes payments directly to service providers, such as qualified physical therapy providers, rather than to the patient who is the Medicare beneficiary. A provider must sign a Medicare Provider Enrollment Agreement to participate in the Medicare Program. When a provider signs a Medicare Provider Enrollment Agreement, the provider agrees to learn and adhere to Medicare and other federal health care program laws, regulations, and program instructions.

13.     The Provider Enrollment Agreement states, "I understand the payment of a claim by Medicare or other federal health care programs is conditioned on the claim and the underlying transaction complying with such laws, regulations and program instructions...."

14.     All healthcare providers, including qualified physical therapy staff, must comply with applicable statutes, regulations and guidelines, including those issued by the MAC, in order to be reimbursed by Medicare Part B.

15.     MACs issue guidance to providers as to what procedures and services will be eligible for payment under the Medicare statute.  That guidance comes in the form of "Local Coverage Determinations" or "LCDs."

16.     This policy states in part:

> ... In the case of maintenance therapy, treatment by the therapist is necessary to maintain, prevent or slow further deterioration of the patient's functional status and the services cannot be safely carried out by the beneficiary him or herself, a family member, another caregiver or unskilled personnel.... Services that do not require the professional skills of a therapist to perform or supervise are not medically necessary, even if they are performed or supervised by a therapist, physician or NPP [Non-Physician Practitioner]. The skills of a therapist may also be furnished by an appropriately trained and experienced physician or NPP, or by an assistant (PTA, OTA) appropriately supervised by a therapist.... If at any point in the treatment it is determined that the treatment becomes repetitive and does not require the unique skills of a therapist, the services are non-covered. .... There may be circumstances where the patient, with or without the assistance of an aide or other caregiver, does activities planned by a clinician. Although these activities may be supportive to the patient's treatment, if they can be done by the

patient, aides or other caregivers without the active participation of qualified
professional/auxiliary personnel, they are considered unskilled...."

LCD L33631 at 5-6.


17.    LCD L33631 also identifies "Personnel NOT Authorized to Provide Outpatient Therapy

Services" as follows:

Aides, athletic trainers... are not considered qualified therapy professionals and
may not bill their services under the Medicare therapy benefit, even if performed
under the supervision of a qualified therapist. ... CMS establishes the
qualifications to assure that all personnel who provide therapy services are
suitably trained in the discipline they practice. Personnel who do not meet the
applicable professional standards to be considered qualified
professional/personnel cannot furnish or be paid for physical or occupational
therapy services....

LCD L33631 at 7.

### The MaineCare Program

18.    During the relevant years, CPT was also a MaineCare provider, which was Maine's

version of Medicaid. Medicaid is a health care program jointly funded by federal and state

sources that provided health insurance and nursing home coverage to disabled and low-income

individuals. MaineCare is administered by the Maine Department of Health and Human Services

("MDHHS") pursuant to federal and state regulations.

19.    The MaineCare Benefits Manual ("MBM") is the governing policies and procedures

guide for MDHHS and its enrolled providers.

20.    A provider must sign a MaineCare/Medicaid Provider Agreement ("Provider

Agreement") to participate in the MaineCare program. When a provider signs a Provider

Agreement, the provider agrees to learn and adhere to MaineCare/Medicaid and other federal and

state health care program laws, regulations, and program instructions.

21.    MaineCare covers physical therapy services provided by licensed PTs or Physical

Therapy Assistants ("PTA") who were enrolled as MaineCare providers.  From 2005 through

2011, the MBM stated in part:

> Physical Therapy Practitioner: an individual who is licensed as a physical
> therapist or licensed as a physical therapy assistant working under the supervision
> of a licensed physical therapist ….

MaineCare Benefits Manual, Ch. 2, Sec. 85.02-3 (2011).

22.    The current MBM further states:

> All professional staff must be conditionally, temporarily, or fully licensed as
> documented by written evidence from the appropriate governing body.  All
> professional staff must provide services only to the extent permitted by licensure.
> The following professionals are qualified professional staff: Physical Therapist,
> Physical Therapy Assistant ….

MaineCare Benefits Manual, Ch. 2, Sec. 85.09-1 (2014).

23.    At no point does the MBM list a PT Aide as a Qualified Professional Staff member who

is eligible to treat MaineCare clients and bill for their services.

### Veterans Affairs – Fee Basis

24.    The Fee Basis Program is administered by the Veterans Health Administration of the

Veterans Affairs ("VA").  Veterans are authorized Fee Basis ("VA – Fee Basis") care if they are

legally eligible for such care and VA facilities are not feasibly available to meet the patient's

medical needs.  VA – Fee Basis care may be reimbursed for travel expenses from their home to

the fee provider, prescription services in emergent situations, non-VA hospitalization, and for

outpatient care.

### Health Care Billing

25.    To get reimbursed by Medicare, MaineCare, and other major health insurance plans at

issue in this case, the provider was required to submit a claim, either electronically or in writing.

The claim must include information identifying the medical provider, the patient, the date or dates of service, and the services rendered. The claims must be only for medically necessary services that are actually rendered. Most plans also require providers to maintain patient records verifying the provisions of services.

26.     Claims are submitted using standardized diagnosis and procedural codes published by the American Medical Association. During the relevant years, CPT billed insurance plans using a variety of procedural codes. Several physical therapy procedural codes are time-based codes that pay the provider a set amount for each 15-minute of service performed. If a provider billed for four units of a time-based code when only 30 to 45 minutes of service was provided to a patient, then that provider "upcoded" the claim.

## THE INVESTIGATION

27.     Morrison was employed at The Health Club from September 23, 2002 through July 21, 2016. Initially, he was paid $13.00 per hour and was responsible for running The Health Club and served as an Athletic Trainer in the gym. Morrison provided instruction to clients on how to use the exercise equipment, and supervised the operation of the tanning booths and the pool.

28.     In 2005, Morrison was promoted and became a salaried employee (making $30,000 per year). Upon promotion, Morrison became Manager/Executive Director of The Health Club and CPT, and was instructed by the owners to run the business. Morrison supervised the licensed Physical Therapists and PT Assistants, and was solely in charge of purchasing, billing, credentialing, making deposits, scheduling, and keeping up-to-date with changes to insurances. In addition to these duties, Morrison also served as a Physical Therapy Aide at CPT.

29.     In 2007, an individual identified as PT-1 received a Master's in Physical Therapy, and in 2009, a Doctorate in Physical Therapy, both from Husson University. Morrison hired PT-1 as a

Graduate PT for CPT in 2008.  As a Graduate PT, she needed another physical therapist on staff to sign off on all of her progress notes and other paperwork.  Eventually, PT-1 became the primary physical therapist at CPT.

30.    While employed at CPT, PT-1 was not aware that a PT Aide could not treat clients and bill for their time.  On several occasions, PT-1 and another physical therapist questioned Morrison about whether he could provide services to clients, but Morrison showed them a document from the State of Maine that purportedly stated PT Aides could treat clients at the direction of a PT.[1]

31.    Physical therapists at CPT documented the services they performed on progress notes.  In 2014, CPT began using Therabill, a web-based electronic records management system.  With Therabill, the staff could create their progress notes electronically.  Therabill was also used to track client appointments on each provider's schedule.  From October 1, 2014 through July 27, 2016, Morrison maintained his own schedule of clients on Therabill, including clients who had Medicare, MaineCare, VA – Fee Basis, and other private insurance clients.  He submitted bills to these insurance plans for the services he provided to their beneficiaries.

**The Health Club Finances**

---

[1] In January of 2017, six months after he was terminated by The Health Club, Morrison filed a PT Board complaint against PT-1's license, alleging, among other things that she treated patients without proper referrals from doctors, and directed him to provide services that he was not qualified to provide.  She responded to the complaint by stating, in part, that Morrison was her supervisor and he was soley responsible for the billing of claims.  In June of 2017, the PT Board concluded its investigation into Morrison's complaints of PT-1.  According to PT-1, she understands that so long as she did not get any additional complaints filed against her license for the following year, she would not face any disciplinary action.

32.     According to one of Trade Winds' owners, CPT was created in about 2005 because The Health Club was not making enough money.  Once CPT became operational, it made the majority of the income for The Health Club.

33.     In 2014, The Heath Club, including CPT, was not as profitable as the owners believed it should be.  When one of the Trade Winds' owners questioned Morrison about this, Morrison always had an excuse as to why The Health Club was not doing well, and would always say that he would work on improving its financial situation.

34.     The Health Club and CPT utilized one bank account at Camden National Bank ("CNB"). Morrison was never given signing or access privileges to the CNB bank account, but he did have the account number and routing number, as he was responsible for depositing cash and checks into the The Health Club's account.  If Morrison was on vacation, then one of the Trade Winds owners who supervised the hotel would make deposits to The Health Club's account.

35.     The Health Club's receipts included payments by insurance plans for CPT patients, and checks and cash paid by health club members, CPT patients and tanning booth customers.

36.     From September of 2008 until August of 2016, The Health Club employed a receptionist who assisted Morrison by checking in patients and by collecting payments from CPT patients, health club members or tanning customers.  When she collected cash, she would record the amount and give the customer a cash receipt.  The receptionist put all of business receipts she collected, including cash, into an envelope and left it at the hotel front desk after her shift so that Morrison could deposit the receipts.  According to this employee, she typically collected $100 to $150 per day in cash just from the tanning customers.

37.     In September of 2015, Morrison told the receptionist "no more receipts" because they were not busy enough to keep receipts.

38.    Morrison had access to two Trade Winds credit cards that he could use for legitimate business expenses of The Health Club, including CPT.  One of these cards was a Capital One Spark Business credit card with an account number that ended in 7640.  Morrison did not have authority to use this card for personal expenses or for the business expenses of the Trade Winds Motor Inn or its restaurants, or for Liberty Hospitality LLC.

39.    Trade Winds' management conducted no oversight audits of The Health Club or of CPT.  However, about once a month, Morrison would send one of the Trade Winds owners a monthly summary report to appraise him of how the business was doing.   Morrison also provided his employer with a monthly summary about CPT claims that were billed and denied by the various insurance plans.  According to the Trade Winds owner who received this summary, the total amount of denied claims tended to be within a normal scope of business, so he was never suspicious of these denials.

40.    In 2014, the owners of Trade Winds told Morrison that they wanted to close down The Health Club.  However, Morrison sent an email that persuade them to keep it open.  For a short period after this shut down discussion, The Health Club did better financially, but this improvement did not last, and it quickly went into a negative state again.

41.    In February of 2016, the Trade Winds owners hired a consultant to look at The Health Club because it was not bringing in enough money to cover its payroll.  This consultant became Morrison's boss.  The consultant had a phone conference each week with the Trade Winds owners, Morrison, and PT-1 to discuss the finances of The Health Club.

42.    In April or May of 2016, during one of these conference calls, one of the owners suggested getting rid of tanning because it was not bringing in any money.  Morrison reportedly

"threw a temper tantrum" and said that tanning brought in a lot of cash to the business and that she would be "crazy" to close this part of the business.

43.    After this meeting, the owner went across the street to the bank and asked the bank teller when the last cash deposit was made to the The Health Club account. The cashier said that the last time cash was deposited to the The Health Club account was when she – the owner –last made a deposit. In other words, Morrison never deposited any cash to the account.

44.    A review of the bank records for the CNB account utilized by The Health Club revealed that from 2008 to 2014, the cash deposits to this account ranged from $1,908 in 2013 to $17,989 in 2009. However, beginning in 2014, the cash deposits dropped off dramatically and only amounted to $501 in 2014, $380 in 2015 and $247 in 2016.

45.    Meanwhile, the consultant began reviewing the credit card expenses incurred by Morrison on the Capital One card and thought that the amount was outrageous. He asked Morrison to provide him with copies of his credit card invoices. Morrison ignored his request for weeks. However, the consultant finally demanded that Morrison provide him with invoices within a week. When Morrison finally provided copies of his credit card invoices to the consultant, the consultant saw several expenses that appeared to be unauthorized, such as tampons, excessive cleaning supplies, and hockey equipment.

46.    Morrison was officially terminated from The Health Club on July 21, 2016.

### Notice of Violation

47.    In March of 2010, the Maine Department of Health and Human Services, Division of Audit, Program Integrity ("PI") requested medical records from CPT for six MaineCare members for services billed for these members between January 1, 2008 and December 31, 2008,

11

as it was conducting an audit of the practice. Upon completing its review of these MaineCare records, PI determined that it needed to expand the scope of its review.

48.    In August of 2010, PI requested fifty-nine additional medical records from CPT from January 1, 2007 through December 31, 2009.

49.    In May of 2013, PI issued CPT a Notice of Violation ("NOV") that cited CPT for a number of inadequacies, including that the number of units billed were greater than the units of service document in the daily progress notes, and that a "…service was performed by an aide and not signed off by a Physical Therapist." PI determined that MaineCare overpaid CPT in the amount of $130,675.18.

50.    Following the NOV, Morrison provided a response to each of PI's findings and appealed the decision all the way up to the Commissioner for MDHHS, Mary Mayhew ("Commissioner Mayhew"). During the appeals process, Morrison was successful in lowering the MaineCare overpayment amount to $122,953.83, but ultimately, Commissioner Mayhew found that a MaineCare overpayment existed (in the amount of $122,953.83). At no point did Morrison inform his employer of PI's audit, the NOV, or Commissioner Mayhew's Final Decision in owing MDHHS a MaineCare overpayment.

51.    The Trade Winds' management team only found out about the NOV and the MaineCare overpayment after Morrison was terminated.

### Health Care Fraud

52.    Based upon a review of the CPT records, paid claims data to the various insurance plans, and numerous interviews with witnesses, your affiant had determined that Morrison submitted numerous false claims for payment on behalf of CPT totaling approximately **$177,833.98** and covering the period October 1, 2014 through July 21, 2016. These false claims can be

summarized as follows: (1) claims that "upcoded" the number of services performed; (2) claims that billed for services of Morrison who was only a PT Aide; (3) claims that were purported for services performed by a PT who was not, in fact, employed by CPT at the time of the claims; and (4) claims that were false for various other reasons.

### Upcoding

53.     In January and March of 2017, investigators requested progress notes from CPT for all Medicare, MaineCare, VA – Fee Basis, and private insurance beneficiaries from October 1, 2014 through July 21, 2016. In comparing the progress notes to the claims submitted to insurance plans by Morrison, investigators discovered that Morrison had often exaggerated, or upcoded the number of units of service performed as documented by the rendering provider on the progress note.

54.     Below is a summary schedule of the fraudulent claims upcoded by Morrison:

| Insurance Plan | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|
| Medicare | $3,912.81 | $22,325.97 | $18,952.86 | $45,191.64 |
| MaineCare | $1,484.53 | $5,203.83 | $4,915.76 | $11,604.12 |
| VA – Fee Basis | $0 | $2,376.34 | $105.61 | $2,481.95 |
| Anthem BCBS | $0 | $1,357.64 | $3,054.56 | $4,412.20 |
| Total | $5,397.34 | $31,263.78 | $27,028.79 | $63,689.91 |

### Claims for Services Performed by PT Aide

55.     As stated above, PT Aides are not qualified physical therapy providers, who are eligible to treat clients and bill for the services they provide. In reviewing progress notes obtained by CPT from October 1, 2014 through July 21, 2016, investigators found that Morrison was the rendering provider for a number of claims billed to insurance plans.

56.     Below is a summary schedule of the fraudulent claims Morrison billed when he was the rendering provider:

| Insurance Plan | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|
| Medicare | $564.17 | $27,265.55 | $22,080.39 | $49,910.11 |
| MaineCare | $106.40 | $4,817.73 | $3,900.57 | $8,824.70 |
| VA – Fee Basis | $145.82 | $1,656.94 | $681.53 | $2,484.29 |
| Anthem BCBS | $0 | $1,307.78 | $2,521.88 | $3,829.66 |
| Total | $816.39 | $35,048.00 | $29,184.37 | $65,048.76 |

## Claims for Services Performed by PT-2

57.     A physical therapist, identified herein as PT-2, was employed at CPT from April 3, 2009 through March 19, 2010, and then again, from September 1, 2015 through December 12, 2015. Nevertheless, based upon a review of paid claims data and as well as the progress notes provided by CPT, it appears that Morrison submitted claims on behalf of CPT in which PT-2's name appeared in progress notes from October of 2014 through August of 2015 when PT-2 was not an employee of CPT.

58.     Below is a summary schedule of the fraudulent claims Morrison billed for PT-2, while she was not employed by CPT:

| Insurance Plan | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|
| Medicare | $559.98 | $7,762.84 | $0 | $8,322.82 |
| MaineCare | $206.57 | $2,818.49 | $0 | $3,025.06 |
| VA – Fee Basis | $274.06 | $731.16 | $0 | $1,005.22 |
| Anthem BCBS | $63.77 | $166.78 | $0 | $230.55 |
| Total | $1,104.38 | $11,479.27 | $0 | $12,583.65 |

## Other

59.     While PT-1 was pulling records together for HHS-OIG's request, she discovered instances when Morrison recorded clients on her schedule when she was working for her other employer, Maine Center for Integrated Rehabilitation ("MCIR").  In May of 2017, PT-1 provided investigators with copies of her MCIR time sheets, which investigators used to compare to claims billed by Morrison for CPT.  During this review, investigators found instances when

Morrison billed claims indicating that PT-1 was the rendering provider when she was actually working at MCIR.

60.    Furthermore, in comparing the claims billed by Morrison, to Therabill's server records, investigators discovered that at times, Morrison billed claims to an insurance company when a physical therapy appointment was cancelled or deleted, or not on the provider's schedule for the date of service billed and there was no progress note indicating the session took place, all in violation of the rules governing the applicable insurance plans.

61.    Below is a summary schedule of the fraudulent claims Morrison billed for the above various other reasons:

| Insurance Plan | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|
| Medicare | $0 | $1,507.24 | $37.10 | $1,544.34 |
| MaineCare | $3,548.82 | $17,272.75 | $13,597.99 | $34,419.56 |
| VA – Fee Basis | $0 | $224.76 | $0 | $224.76 |
| Anthem BCBS | $0 | $183.89 | $139.11 | $323.00 |
| Total | $3,548.82 | $19,188.64 | $13,774.20 | $36,511.66 |

62.    Below is a summary schedule of all of the fraudulent claims billed by Morrison:

| Insurance Plan | Upcoding | PT Aide Fraud | PT-2 Fraud | Other | Total |
|---|---|---|---|---|---|
| Medicare | $45,191.64 | $49,910.11 | $8,322.82 | $1,544.34 | $104,968.91 |
| MaineCare | $11,604.12 | $8,824.70 | $3,025.06 | $34,419.56 | $57,873.44 |
| VA – Fee Basis | $2,481.95 | $2,484.29 | $1,005.22 | $224.76 | $6,196.22 |
| Anthem | $4,412.20 | $3,829.66 | $230.55 | $323.00 | $8,795.41 |
| Total: | $63,689.91 | $65,048.76 | $12,583.65 | $36,511.66 | **$177,833.98** |

**Embezzlement from a Health Care Benefit Program**

63.    As described above, the Trade Winds owners gave Morrison a Capital One Spark Business credit card, with an account number ending in 7640, to use for purchasing authorized

business expenses for The Health Club, including CPT. The Trade Winds owners paid this

credit card account from the The Health Club operating account at CNB.

64.     If there was not enough money in The Health Club's operating account, then the Trade

Winds Motor Inn would loan money to The Health Club to cover its expenses. In total,

approximately $275,000 was loaned from Trade Winds Motor Inn to The Health Club. In 2017,

Trade Winds Motor Inn wrote this loan off as a bad debt, as The Health Club was never able to

repay its loans to the hotel. According to one of the Trade Winds owners, if she believed that

The Health Club and CPT did not generate enough revenue to cover its payroll and its Capital

One expenses, she would have questioned the legitimacy of the business.

65.     During the course of the investigation, investigators learned that Morrison made many

purchases through the website Amazon.com. In reviewing records obtained from Amazon.com

related to Morrison's account, and comparing them to purchase invoices that Morrison created

for The Health Club, investigators determined that Morrison often altered the item description

column of the invoices he provided to Trade Winds management to make them appear as if they

were legitimate business expenses.

66.     Investigators provided one of the Trade Winds owners with a spreadsheet containing all

of Morrison's Amazon.com purchases that were paid with the The Health Club Capital One

credit card from June 9, 2011 through June 23, 2016. According to Amazon.com, many of these

purchases were delivered directly to Morrison's home.

67.     In total, from June 9, 2011 through June 23, 2016, Morrison charged a total of

$78,939.98 to The Health Club Capital One credit card. Out of this total, the owner determined

that Morrison made approximately $70,521.91 in unauthorized purchases with the The Health

Club card. Some of the unauthorized purchases made by Morrison include: Infant/Toddler

Disney Toy Story sneakers, Spongebob Squarepants Dive Sticks Set, Youth Hockey elbow pads, Fisher-Price kitchen and table, Polly Pocket safari vehicle, Lincoln Logs, Dramamine Motion Sickness Relief for kids, Forever 21 gift card, Panera Bread gift card, Rainforest Café gift card, JCPenny gift card, Claire's gift card, Southwest Airlines gift card, pet food, cat litter, Pull-Ups Training Pants, KEEN sandals, hockey goalie sticks, canned tuna fish, Stove Top stuffing, potato chips, Ketchup, Goldfish snacks, cookies, and a bunk bed.

### Conclusion

68.    Based on the information set forth above, there is probable cause to believe that Michael Morrison knowingly and willfully executed and attempted to execute a scheme and artifice to defraud Medicare, Medicaid, other federal healthcare benefit programs, and private insurance companies, and to obtain, by means of materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of, Medicare, Medicaid, other federal healthcare benefit programs, and private insurance companies, in connection with the delivery of and payment for health care benefits, items and services, by submitting false and fraudulent claims for services that were not rendered, in violation of Title 18, United States Code, Section 1347.

69.    Additionally, there is probable cause to believe that Michael Morrison knowingly and willfully embezzled, stole and converted without authority to his own use the funds and property of The Health Club, a health care benefit program, with a value of said funds in excess of $100.

Catherine Richard
Special Agent
U.S. Department of Health and Human Services
Office of Inspector General

Dated:  6/27/2018

STATE OF MAINE

Cumberland County

Subscribed and sworn to before me this 26th day of June, 2018.

John H. Rich III
United States Magistrate Judge